THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WAYNE LINDSAY *et al.*, Defendants-Appellants.

First District (5th Division)   Nos. 77-586, 77-1686 cons.

Opinion filed December 8, 1978.

James J. Doherty, Public Defender, of Chicago (Suzanne M. Xinos, Assistant Public Defender, of counsel), for appellants.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and Francis X. Speh, Jr., Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Following a jury trial, defendants were each found guilty of the murder of Henry Carter, the murder of Leslie Scott and aggravated battery and attempt murder of Leo Carter. (Ill. Rev. Stat. 1973, ch. 38, pars. 8—4, 9—1, 12—4(b)(1).) Defendants were sentenced to a minimum of 100 and a maximum of 200 years for each murder and 50 to 100 years for the attempt murder, the sentences to run consecutively. The trial court found that the aggravated battery merged with the attempt murder and did not enter judgment on that verdict. A co-defendant, John Perkins, was found not guilty by the court at a bench trial conducted concurrently with the jury trial.

On appeal the three defendants are represented by the public defender and contend that: (1) they were improperly convicted of both aggravated battery and attempt murder; (2) the imposition of consecutive sentences was improper; (3) they were denied a fair trial since the prosecutor was allowed to show that Scott and Leo Carter were to be witnesses in Elijah Baptist's trial for murder and that Elijah Baptist was the brother of defendant, Michael Baptist; and (4) that the instructions for attempt murder given to the jury were improper. Lawrence and Baptist also filed supplemental *pro se* briefs and further contend that: (1) by reason of the reference to Elijah Baptist, they were denied due process of law, and the trial judge had a duty to declare a mistrial *sua sponte*; (2) that the court should have suppressed certain physical evidence before trial; (3) that defendants were denied effective assistance of counsel; (4) that their warrantless arrest was improper since they were engaged in no illegal activity when arrested; (5) the admonishments given by the judge to disregard certain testimony were insufficient; and (6) they were not proven guilty beyond a reasonable doubt. Michael Baptist also contends that the State's key witness, Leo Carter, was incompetent and continually perjured himself. We affirm. The pertinent facts are as follows.

Each of the three defendants was represented by separate counsel at trial, as was John Perkins. Prior to trial defendants filed a motion to quash the warrantless arrests and to suppress any evidence and identification which flowed from the arrest. At this hearing, the State called three witnesses. Officer O'Leary testified that on June 14, 1975, about 12:30 a.m. he responded to a call at 445 West 60th Place and found Leo Carter lying

on the floor. He saw that Carter had been shot and asked what happened. Leo Carter told him that his brother, Henry Carter, Leslie Scott, and he had been shot by "Knocks," "Big Red" and Michael Baptist, and that they could be found at 600 West 60th Street. He further testified that he knew "Big Red" to be defendant Wayne Lindsay. He communicated this information to Officer Ferrentino who proceeded to that address. O'Leary waited until an ambulance arrived to take Leo Carter to the hospital and then went to 600 West 60th Street. While there he saw Wayne Lindsay walking east on 60th Street with Calvin Anderson. He told another policeman that Lindsay was a suspect. Wayne Lindsay was immediately placed under arrest.

Officer Ferrentino testified that on June 14, 1975, at about 12:30 a.m. he and his partner met Officer O'Leary at 444 West 60th Place, and they were told by O'Leary that the two victims could be found at 600 West 60th Place, as well as the defendants. Ferrentino stated that Officer O'Leary had told him that one of the defendants, apparently Michael Baptist, lived in that building. While guarding the rear of the building to prevent escape, Ferrentino observed a storage closet to one side of the rear door. The door of the closet was ajar, and the officer looked inside, thinking that Michael Baptist could be hiding there. Ferrentino saw a discarded toilet with two handguns inside, one a .38 revolver and the other a .32 automatic. Both were recovered for evidence.

The two officers remained in the rear of the building until they learned that the suspects had been taken into custody. Michael Baptist had been arrested in the basement apartment which Ferrentino had been guarding. Officer Ferrentino admitted that no search or arrest warrants had been issued for any of the defendants, any apartments or the closet at the rear door.

Finally Officer Benecki testified that on June 14, 1975, about 1 a.m. he spoke with Calvin Anderson about a person named "Knocks." Calvin told him that that would be Lennox who lived in the 6400 block of Hoyne. After questioning Michael Baptist about "Knocks" the police determined that the suspect was Lennox Lawrence who lived at 6458 South Hoyne. He was arrested at about 5 a.m. on June 14, 1975.

Wayne Lindsay testified that he was arrested outside of his home at 600 West 60th Street at about 1 a.m. on June 14, 1975. He stated that at the time of arrest he was not violating any law and was not shown any warrant.

The court then denied the defense motions to quash the arrests and suppress evidence and identification.

Defendants also filed a motion *in limine* requesting that the State be precluded from referring to Elijah Baptist, any prior incident involving

him, or any relationship between him and any of the defendants. Following a hearing, the trial court denied defendants' motion.

The evidence introduced at trial showed that on July 29, 1974, Leslie Scott and Leo Carter witnessed the robbery and murder of one Sam Blue by Elijah Baptist, the brother of Michael Baptist. On September 23, 1974, the two appeared as witnesses for the prosecution at a preliminary hearing concerning the murder. The trial of Elijah Baptist was set for July 15, 1975, and Carter and Scott were included in the State's list of witnesses.

Leo Carter here testified that on the night of June 13, 1975, at about 10:30 p.m., he, his brother, Henry Carter, and Leslie Scott were returning home from a store when they met the defendants Wayne Lindsay, Michael Baptist, Lennox Lawrence and John Perkins on the street. Wayne Lindsay invited them to a party at his home at 600 West 60th Street, and all seven went to Lindsay's second floor apartment. When they arrived at about 11, no one else was present. They all sat in a rear bedroom listening to records and sharing a single pint bottle of wine. After about 45 minutes, Leo Carter asked Lindsay where the women were and Lindsay responded that they were coming. Shortly thereafter, all defendants except Lindsay left the room and then returned a few minutes later. Defendant Lawrence asked the others if they were ready and each nodded his head up and down. Lawrence then put a gun to Henry Carter's head and Lindsay put a gun to Leo Carter's head while Baptist and Perkins held Leslie Scott. They exited to the rear of the building, down a back stairway, and into the lot behind the building. They walked to the loading docks of a beer factory which was about 500 feet to the rear (north) of Lindsay's home. There Lindsay asked Leo Carter "who told on his cousin." When Leo replied that he did not know, Lindsay told Leo that he liked him but he had to do it. Lindsay put the gun to the bridge of Leo's nose and shot him between the eyes. When Leo fell to the ground, Lindsay shot him again in the back. Leo said that he saw Lawrence shoot his brother Henry in the head and chest and his brother fell beside him. Leslie Scott was also shot to death, although Leo did not see his shooting. Leo watched as the defendants ran back to Lindsay's building, and then he crawled to his cousin's house at 444 West 60th Place, a distance of about two blocks.

Over the defendants' objections Leo was permitted to testify that he and Leslie Scott had witnessed the robbery and murder of Sam Blue and that Elijah Baptist shot Blue. He further testified that Michael Baptist had told him that Elijah was his brother. On examination by the court, outside the presence of the jury, Leo also stated that Elijah and Wayne Lindsay referred to each other as cousins.

The court would not allow the State to show that Elijah was convicted of Blue's murder and instructed the jury to consider Leo's testimony solely for the purpose of establishing motive for the murders and for no other purpose.

There were several inconsistencies in Leo Carter's testimony which are relevant on appeal. At trial, he testified that he had told Officer O'Leary immediately after the shooting that all four defendants were involved. O'Leary testified that Leo named only Lindsay, Baptist, and Lawrence as his attackers on June 14, 1975. O'Leary's report included only those three names. Perkins was not mentioned until sometime later. Also, Carter testified that he saw Wayne Lindsay shoot him in the back; however, it appears from a police report that he had previously told the police that after the first shot he was unconscious and did not remember anything. Finally, at trial Carter stated that he did not know Calvin Anderson but a police officer testified that Carter and Anderson were friends.

Officer Ferrentino of the Chicago Police Department testified that on June 14, 1975, he and his partner received a call and proceeded to 444 West 60th Place, arriving at about 12:35 a.m. They found Officer O'Leary speaking to Leo Carter, who was lying on the floor. O'Leary was repeating what Carter said, and Ferrentino testified that Carter told O'Leary that there were two other bodies and that the defendants could be found at 60th and Wallace (600 West 60th Street).

Officer Ferrentino and his partner proceeded to the beer factory and found the bodies of the two victims, "as Leo had directed us to that location." At that point, defendants' counsel objected that what Leo directed was hearsay and should not be admitted as evidence. The court sustained the objection and the jury was instructed to disregard the statement.

Officer Ferrentino continued and testified that he next went to the rear of the building at 600 West 60th Street, where he discovered the two handguns, as testified at the hearing on the motion to suppress the evidence. He waited there until an evidence technician came to retrieve the two weapons. While at 600 West 60th Street he also saw two people in police custody. He later learned that they were Wayne Lindsay and Michael Baptist.

About 5 a.m. Officer Ferrentino arrested Lennox Lawrence at his home at 6458 South Hoyne. John Perkins was not arrested until sometime later since Leo Carter apparently did not tell the police of his involvement until after June 14, 1975.

John Olejniczak, a Chicago Police Department fingerprint technician, testified that he had made a comparison of a print found on the .38

revolver and determined that it matched the right ring finger of Lindsay.

John Sadunas, a Chicago Police Department firearms expert, testified that in his opinion the bullets which were recovered from the murder victims were fired from the two pistols recovered from the toilet.

After the close of the State's evidence, the three defendants made a motion for a directed verdict, which was denied.

Only defendant Lawrence took the stand in his own behalf. He stated that on the night of June 13 he had gone to bed at about 9 p.m. and did not awake until the police arrested him at about 5 a.m.

After the close of all the evidence, the defendants again made a motion for a directed verdict, which was denied. The jury instructions were then discussed. The court noted that it had instructed the jury to consider Leo's testimony regarding his witnessing Sam Blue's murder by Elijah Baptist solely for the purpose of establishing motive in the present case. The court indicated that it would again include this limiting instruction in its charge to the jury. The defense attorneys objected that it would unfairly highlight that testimony and the instruction was not given. No objection was made by defendants to the instructions on attempt or the definition of murder. After the jury had been instructed and retired, defendants moved for a mistrial based on allegedly improper comments made in the State's closing argument. This motion was also denied.

The jury found the three defendants guilty of all counts, including the aggravated battery and attempt murder of Leo Carter. Perkins was found not guilty by the court. In entering judgments on the verdicts, the court observed, "I am going to enter judgment on the attempt murder of Leo Carter because the aggravated battery count would merge in attempt murder, so I am entering judgment on the attempt murder of Leo Carter * * * *"

After a hearing in mitigation and aggravation, the court sentenced each defendant to consecutive sentences of 100 to 200 years for each murder and 50 to 100 years for the attempt murder.

OPINION

I.

Defendants first contend that they were improperly convicted of both the aggravated battery and attempt murder of Leo Carter and ask that the conviction for aggravated battery be vacated. Unlike *People v. Lilly* (1974), 56 Ill. 2d 493, 309 N.E.2d 1, relied upon by defendants, no judgment was here entered on the verdicts for the lesser included offense of aggravated battery. Here, the trial court did instruct the jury and provide verdict forms on both offenses. Since the evidence clearly proved

both charges, the jury properly returned guilty verdicts on both. However, the trial court entered judgment only on the attempt murder of Leo Carter "because the aggravated battery count would merge in attempt murder."

The verdict of the jury is merely the basis upon which the judgment of the court is entered and is not the judgment of the court. (*People ex rel. Wakefield v. Montgomery* (1937), 365 Ill. 478, 481, 6 N.E.2d 868.) "Conviction" is defined in section 2—5 of the Criminal Code of 1961 (Ill. Rev. Stat. 1975, ch. 38, par. 2—5) as follows:

> " 'Conviction' means a judgment of conviction or sentence entered upon a plea of guilty or upon a verdict or finding of guilty of an offense, rendered by a legally constituted jury or by a court of competent jurisdiction authorized to try the case without a jury."

■■ Absent an adjudication by the court as to the lesser included offense, none of the prejudice found in *Lilly* would attach to defendants. Judgments of conviction were entered only on the greater offenses of attempt murder. There is no conviction as to the offense of aggravated battery which requires vacation under *Lilly*.

## II.

Defendants next contend that the imposition of consecutive sentences was improper under section 5—8—4(a) of the Unified Code of Corrections which provides in pertinent part:

> "The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective." (Ill. Rev. Stat. 1975, ch. 38, par. 1005—8—4(a).)

Defendants claim that the shooting of three people in rapid succession constitutes a single course of criminal conduct.

A person may not be convicted of multiple offenses arising out of the same act or the same conduct. (*People v. Schlenger* (1958), 13 Ill. 2d 63, 147 N.E.2d 316; *People v. Duszkewycz* (1963), 27 Ill. 2d 257, 189 N.E.2d 299.) However, these cases " 'were not intended to cover situations in which more than one offense arises from a series of closely related acts and the crimes are clearly distinct and require different elements of proof.' " (*People v. Williams* (1975), 60 Ill. 2d 1, 14, 322 N.E.2d 819.) The *Williams* case involved an armed robbery and murder which took place inside the victims' house. The court focused on the criminal objectives of the defendants' acts to determine if the two offenses were independently motivated. The court observed that

> "The purpose of the entry was robbery, not murder, and that objective changed to murder only when the robbers were confronted by Mr. Calderone [the victim] with a gun in his hand.

Then, they chose to commit a separate act for the purpose of killing Mr. Calderone. That shooting can be viewed as a means of removing an obstacle to their original objective of robbery, but it is also evident that at least part of their reason for killing was to avoid injury or apprehension by Mr. Calderone." *Williams,* at 14.

The independent motivation test was rejected in *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, *cert. denied,* 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273 (1977), as a standard for determining whether multiple convictions and concurrent sentences are permissible. The court held that in concurrent sentence situations, when more than one offense arises from a series of incidental or closely related acts and offenses which are not, by definition, lesser included offenses, convictions with concurrent sentences can be entered. The court noted:

"Defendant's criminal objective, therefore, is only relevant in the determination of whether *consecutive* sentences can be imposed." (Emphasis in original.) *King,* at 565.

Focusing on the criminal objectives of the defendants here, we find that the acts had a separate purpose. The shooting of each victim was a separate act done to prevent him from testifying in a courtroom. The purpose in killing Leo Carter and Leslie Scott was to prevent them from being witnesses against Elijah Baptist. This could have been accomplished without the killing of Henry Carter but it became necessary to kill the latter to prevent him from being a court witness to defendants' own murders. We do not believe that the single course of conduct rule was adopted to free a defendant from the consequences of a series of crimes, involving separate acts, committed against several individuals. Such rule would encourage multiple homicides since no greater sentence could be imposed for a second or third killing.

Defendants also maintain that the court is precluded from imposing a consecutive sentence unless "it is of the opinion that such a term is required to protect the public from further criminal conduct by the defendant." (Ill. Rev. Stat. 1975, ch. 38, par. 1005—8—4(b).) They state that there is no way to determine from the record whether the court so determined. This contention was answered in *People v. Reed* (1977), 51 Ill. App. 3d 479, 483, 366 N.E.2d 1137, as follows:

"It is our view that the legislature framed this statute in language that relieves the trial judge of any obligation to make an express finding in the record that the imposition of a consecutive term of imprisonment was required to protect the public from further criminal conduct by the defendant."

Although the trial court did not make an express finding on this point, the court before sentencing stated:

"I think that in this particular case as a Judge, I have very little

leeway because of the nature of the type of case that I have before me.

Not only was there a murder committed, two murders committed, and attempt murder on a third person, but the motive for these murders was to keep people, two people from testifying in a previous murder case and certainly that shows a complete disregard and contempt for society, for the rights of others."

The trial judge balanced the type of case, the defendants and their backgrounds, and the protection of society, and did find that consecutive sentences were required for the protection of society.

■ A trial court has the discretion to impose consecutive sentences and this determination will not be reversed absent a finding of abuse of discretion. (*People v. Strickler* (1977), 47 Ill. App. 3d 419, 362 N.E.2d 28.) We do not find any abuse of discretion in the imposition of the consecutive sentences in the instant case.

### III.

Defendants, both in the public defender's brief and their *pro se* briefs, contend that the introduction of testimony to show that Leo Carter and Leslie Scott were to be witnesses against Elijah Baptist and the fact that Elijah Baptist was Michael Baptist's brother denied them a fair trial, due process of law and that the trial judge should have declared a mistrial on his own motion. In overruling the defendants' motion *in limine* to exclude such testimony, the trial court made it clear that the testimony concerning the other crime was only to establish motive in the present case and rejected the argument that the prejudicial effect of such testimony outweighed its relevance. The court observed:

"THE COURT: I'd agree with your conclusion if there is a motive they can show the motive, if there is no motive the crime exists without a motive but if there is a motive it has some relevance.

MR. KLING [Defense counsel]: Judge, I think that the point whether or not the affect overrides the relevancy—

THE COURT: I am aware of the prejudicial effect, I agree it certainly is going to be prejudicial as far as the jury is concerned but on the other hand I don't see how this kind of case involving these kind of facts can be tried any other way. The jury will be allowed to be told about that case and the State can go into the motive, so, that motion will be denied.

MR. KLING: Judge, I think at this point—

THE COURT: Let it be clear there should be no reference to the actual trial and the conviction—* * *

* * *—of Elijah Baptist."

The defendants have seized the word "prejudicial" and claim that the trial judge denied them a fair trial by allowing in the prejudicial testimony knowing that it would make the trial basically unfair. They also rely on *People v. Galloway* (1963), 28 Ill. 2d 355, 192 N.E.2d 370, *cert. denied*, 376 U.S. 910, 11 L. Ed. 2d 608, 84 S. Ct. 665 (1964), and contend that the evidence was inadmissible since it did not tend to make the proposition at issue (defendants' guilt) more or less probable.

■■ Defendants have misconstrued the meaning of the court's comments. The testimony concerning Elijah Baptist is prejudicial to the defendants in the same sense that any evidence of guilt would be prejudicial. The State introduced the evidence to establish the motive for defendants' shooting of the three victims. As stated in *People v. Jorczak* (1937), 366 Ill. 507, 513, 9 N.E.2d 227:

> "The presence of a motive which would lead the accused to commit the act charged is important in the consideration of the question whether he committed it. It is always proper to prove motive when it can be done, even though it may disclose another indictable offense."

(See also *People v. Romero* (1977), 66 Ill. 2d 325, 362 N.E.2d 288.) The fact that two of the three victims were witnesses against one of the defendant's brothers in another murder prosecution would clearly explain the reason for the otherwise inexplicable slaying of three people. This evidence satisfied the *Galloway* test since it fairly tends to prove the murder as charged and tended to make defendants' guilt more probable.

■■ The trial judge properly minimized the prejudicial effect of the testimony by precluding the State from telling the jury that Elijah Baptist was in fact convicted for the murder. By so doing the evidence would be addressed only to motive and would not unnecessarily prejudice defendants. The probative value was not outweighed by the prejudicial effect and therefore the evidence concerning Elijah Baptist was properly admitted. In view of the foregoing reasons, the trial judge was clearly under no duty to declare a mistrial *sua sponte*.

### IV.

■■ Defendants next contend that the jury instructions given by the trial court on attempt murder were erroneous in light of *People v. Harris* (1978), 72 Ill. 2d 16, 377 N.E.2d 28. *Harris* requires that an instruction for attempt murder must "make it clear that to convict for attempted murder nothing less than a criminal intent to kill must be shown." (*Harris*, at 27.) The instruction given in the instant case was erroneous for the same reason that those in *Harris* and its consolidated case, *People v. Shields*, were erroneous. The specific intent required in the attempt murder instruction as here given was the intent to commit murder and not the

intent to kill. As was pointed out in *Harris*, when the murder instruction is read in conjunction with the attempt murder instruction, a jury could find a defendant guilty of attempt murder upon evidence that the defendant intended only to cause great bodily harm short of death.

Although defendants failed to object to the instruction at the jury instruction conference, or to specifically allege the instruction as error in their posttrial motions or even raise objection in their appellate briefs until oral arguments, we feel that the interests of justice require that we consider the issue on its merits. Supreme Court Rule 451(c) (Ill. Rev. Stat. 1977, ch. 110A, par. 451(c)); *People v. Harris* (1978), 72 Ill. 2d 16, 377 N.E.2d 28.

In *Harris*, the defendant and a girlfriend had been arguing in his car, when defendant picked up a revolver from the floor and began threatening the girlfriend. She attempted to flee from the car but ran into a barbed wire fence and was injured. The defendant had also gotten out of the car. The girlfriend returned to the car and began to drive off when she saw defendant through the rear view mirror pointing the gun at her. The rear glass shattered and a bullet fragment was later recovered from the left rear seat. Under those circumstances the defendant's intent is unclear. His intent could have been either to kill the girl or to cause bodily harm to her. To instruct a jury that either was sufficient intent for attempt murder would be reversible error. It would resolve an ambiguous set of circumstances against the defendant. In *Harris* there was sufficient doubt whether defendant's intent was to kill or simply wound. The same could be said of the facts in the consolidated case of *People v. Shields* and an even more recent appellate court opinion, *People v. Washington* (1978), 60 Ill. App. 3d 662, 377 N.E.2d 397. In neither of those two cases did the facts clearly and unambiguously show the intent to kill. To allow the erroneous instruction to stand would have been error in those cases since a jury might have found the intent to do great bodily harm and convicted defendant on that basis.

In the present case, a review of the facts can leave no doubt that defendants shot Leo Carter with the specific intent to kill him. First, their motive in shooting Leslie Scott and Leo Carter was to prevent them from testifying against Elijah Baptist. The only way this could be accomplished would be to kill them, since a witness who survives can still testify. All three victims were lined up and shot in the head and back. Two died but by some fortuitous circumstance Leo Carter survived. Surely the fact that the same method produced the desired result in two instances should indicate that death was intended in the third case. Finally, the manner in which Leo Carter was shot, standing alone, would show the act was done with no other intent than the intent to kill. Wayne Lindsay placed a .38 revolver to the bridge of Leo's nose and shot him between the eyes at

point blank range. To cover the freak chance that Leo might survive the first shot, Lindsay shot him again in the back as Leo lay on the ground. The facts show beyond any doubt that the acts were done with the intent to kill.

> "It is not our policy to reverse a judgment of conviction merely because error has been committed, unless it appears that real justice has been denied or that the verdict of the jury may have resulted from such error." *People v. Tranowski* (1960), 20 Ill. 2d 11, 17, 169 N.E.2d 347, *cert. denied*, 364 U.S. 923, 5 L. Ed. 2d 262, 81 S. Ct. 290 (1960), 368 U.S. 978, 7 L. Ed. 2d 440, 82 S. Ct. 484 (1962).

■■ When the evidence adduced is so overwhelming that a conviction would, of necessity, result even if the error were eliminated, a court of review will not reverse the trial court's judgment. (*People v. Blackman* (1976), 44 Ill. App. 3d 137, 141, 358 N.E.2d 50; *People v. Kirkwood* (1959), 17 Ill. 2d 23, 160 N.E.2d 766, *cert. denied*, 363 U.S. 847, 4 L. Ed. 2d 1730, 80 S. Ct. 1623 (1960).) Here, even if the correct instruction had been given, the jury could only find that defendants acted with the specific intent to kill Leo Carter and were guilty of attempt murder. Although the attempt murder instruction was erroneous under *Harris*, we find under the particular facts in this case that the error was harmless beyond a reasonable doubt.

V.

Michael Baptist and Lennox Lawrence contend that the two handguns should have been suppressed prior to trial since the officers had no search warrants for the building at 600 West 60th Street or its premises. They also challenge the validity of their arrest, since they were both arrested without warrants and claim that at the time of their arrest they were doing nothing illegal.

■■ Technically, defendants have waived these objections by failing to raise them in their motions for a new trial.

> "Where the grounds for a new trial are stated in writing [as is the case here], the accused is limited on review to the errors alleged therein and all other errors are deemed to have been waived."
> (*People v. Hairston* (1970), 46 Ill. 2d 348, 367, 263 N.E.2d 840.)

Nor is there any plain error on the record such that this court should take notice of it pursuant to Supreme Court Rule 615(a). (Ill. Rev. Stat. 1977, ch. 110A, par. 615(a).) However, courts have often avoided the waiver rule on the basis of fundamental fairness. *People v. Brown* (1972), 52 Ill. 2d 227, 287 N.E.2d 663; *People v. Roberts* (1978), 56 Ill. App. 3d 667, 372 N.E.2d 143.

■■ A full hearing on the motion to suppress was conducted before trial and the court found probable cause for the arrests. From the testimony

taken at the hearing it appears that this finding was correct. Section 107—2(c) of the Code of Criminal Procedure of 1963 allows a police officer to make an arrest without a warrant when "[h]e has reasonable grounds to believe that the person is committing or has committed an offense." (Ill. Rev. Stat. 1975, ch. 38, par. 107—2(c).) Certainly after being informed by the victim of a shooting that Michael Baptist was one of the people who was involved, Officer Ferrentino had reasonable grounds to arrest Baptist. It is unclear who actually arrested Michael Baptist; however, it does appear that the arrest was made in his basement apartment. Having had reasonable grounds to believe Baptist had just committed a felony and that he was at home, they could legally enter the apartment and arrest Baptist. *People v. Chavis* (1967), 79 Ill. App. 2d 10, 223 N.E.2d 196.

Regarding the handguns, Officer Ferrentino had reasonable grounds for the arrest of Michael Baptist, and reasonably believed that he might be hiding in the storage closet near the rear door. *People v. Sprovieri* (1969), 43 Ill. 2d 223, 252 N.E.2d 531, presents facts very similar to the present case. There the police had reasonable grounds to arrest the defendant for murder and believed he was in a garage. Upon opening the garage door, they did not find defendant but did find evidence of the crime. Concerning those facts the court observed:

> "Normal precautionary measures require that the police eliminate all hiding places before moving on. An entry into the garage was proper under the circumstances in this case. The officers had reason to believe that Sprovieri and his companion might be hiding there or that Judith had suffered the same fate as Vana, whose body was found in an automobile. We therefore hold that once lawfully inside the garage, the police were not obliged to overlook those items which they reasonably thought were connected with the slaying of Vana and which lay in open view." *Sprovieri*, at 227.

In denying the motions to suppress the guns (as well as the identifications of defendants at the hospital), the trial court in the instant case stated:

> "In addition, it certainly seems to me, to be reasonable, under the circumstances, that the officers would look into the shed, having arrived at the door, with probable cause to make an arrest. And the shed being directly to their right, and being a place where one could possibly hide, the door was somewhat ajar, according to the officer's testimony, and a commode is in view, from the door, as shown in the picture. After having gone in there to see whether or not anyone was hiding, which I think they would have been

remissed if they had not, they discovered the guns in the commode. They had a right to then seize the guns.

I don't really think you raised the question about the impropriety of the viewing at the hospital. But in my opinion, that was certainly proper police work, under the circumstances, with the victim being in critical condition, being shot in the head, the incident having occurred just some number of minutes prior to the arrest of the defendants. Under the circumstances, the police acted properly."

■■ The handguns were in plain view once the door of the storage closet was opened and we conclude that the motion to suppress them as evidence was properly denied.

■■ Regarding Lennox Lawrence's arrest the same result is required. Although Carter identified him only as "Knocks," through investigations and talks with Calvin Anderson who was arrested with Wayne Lindsay and Michael Baptist, they were able to determine that "Knocks" was Lennox Lawrence who resided at 6458 South Hoyne. Although his arrest was made without a warrant about 5 a.m., more than four hours after the police learned of the crime, we feel that the circumstances justified the warrantless arrest. The investigation to discover who "Knocks" was took some time. It was very likely that a suspect would flee to avoid arrest. In such a situation an arrest warrant is unnecessary. (*Chapman v. United States* (1961), 365 U.S. 610, 5 L. Ed. 2d 828, 81 S. Ct. 776.) The warrantless arrest here of Lennox Lawrence was based on reasonable grounds and exigent circumstances and was proper.

## VI.

Defendants Lennox Lawrence and Michael Baptist contend that they were denied effective assistance of counsel because counsel were disloyal and failed to produce witnesses who wanted to testify in their behalf. However, defendants cite no specific instances of their counsels' disloyalty, or incompetence, nor does an examination of the record reveal any. Defendants fail to name any witnesses they wanted called at trial and fail to establish any harm in this respect. In their brief Baptist and Lawrence argue that a defendant's right to effective assistance of counsel requires that his attorney not represent conflicting interests and cite several cases on this point. However, they do not establish any actual conflict problem of their own attorneys. As already noted each defendant was represented by separate counsel. There is no dual representation problem presented here and again the record does not disclose any conflict of interest.

The accused bears the burden of clearly establishing incompetence

of counsel in carrying out his duties as trial attorney and that substantial prejudice resulted therefrom, without which the outcome would probably have been different. *People v. Stepheny* (1970), 46 Ill. 2d 153, 263 N.E.2d 83; *People v. Morris* (1954), 3 Ill. 2d 437, 121 N.E.2d 810.

■■ By failing to cite any instance of incompetence or conflict of interest, defendants have not met this burden and we find this issue to be without merit.

## VII.

■■ Defendants Baptist and Lawrence also contend that the prejudicial effect of the alleged hearsay statement of Officer Ferrentino concerning where Leo Carter had directed them was not cured by the judge's admonition to the jury to disregard the comment. The objection was made promptly after the statement and the trial judge immediately sustained the objection and instructed the jury to disregard the statement. An instruction to disregard evidence ordinarily cures error in its admission. (*People v. Nelson* (1970), 124 Ill. App. 2d 280, 260 N.E.2d 251; *People v. Johnson* (1973), 11 Ill. App. 3d 745, 297 N.E.2d 683.) This is particularly true when the improper testimony is not directly responsive to the question and is promptly stricken, with an instruction to the jury to disregard it. (*People v. Kirkwood* (1959), 17 Ill. 2d 23, 160 N.E.2d 766, *cert. denied*, 363 U.S. 847, 4 L. Ed. 2d 1730, 80 S. Ct. 1623 (1960); *People v. Johnson.*) In the present case the reference to what Leo Carter directed was not solicited by the State's Attorney but rather was an inadvertent remark which went beyond the question asked. Any possible error in this regard was cured by the prompt action of the court. Furthermore, even if not cured, any alleged prejudice can only be viewed as harmless. In view of the entire record, and the great evidence of guilt in this case, we cannot say that the jury would have reached a contrary verdict had the statement not been made.

## VIII.

■■ We find no merit in defendants' argument that their guilt was not proved beyond a reasonable doubt. Leo Carter positively identified the three defendants as the murderers. The State produced two handguns that were shown to be the murder weapons through the testimony of the ballistics expert. A fingerprint expert testified that a print from the .38 revolver matched Wayne Lindsay's right ring finger. This was the same gun that Leo Carter claimed Lindsay had held to his head. A motive for the murder was properly shown. Only Lennox Lawrence offered an alibi which the jury obviously discredited. Even though there were several inconsistencies in Leo Carter's testimony, it is for the jury as trier

of fact to weigh the credibility of witnesses and arrive at a verdict. (*People v. Dillon* (1975), 28 Ill. App. 3d 11, 327 N.E.2d 225; *People v. Sykes* (1977), 45 Ill. App. 3d 674, 359 N.E.2d 897.) The jury obviously believed Leo Carter and the verdict will not be disturbed unless the evidence is so improbable or unsatisfactory to suggest a reasonable doubt of the defendants' guilt. (*People v. Benedik* (1974), 56 Ill. 2d 306, 307 N.E.2d 382; *People v. Reese* (1973), 54 Ill. 2d 51, 294 N.E.2d 288.) A positive identification by a single witness with ample opportunity to observe is sufficient to support a conviction. (*People v. Clarke* (1971), 50 Ill. 2d 104, 277 N.E.2d 866; *People v. Williams* (1975), 60 Ill. 2d 1, 322 N.E.2d 819.) When Leo Carter's testimony is coupled with the other relevant evidence of guilt, it is clear that defendants were proved guilty beyond a reasonable doubt.

## IX.

■■ Defendant Michael Baptist raises one final issue in his second supplemental *pro se* brief. He contends that Leo Carter's testimony contained many lies and he was therefore incompetent as a witness. We view the inconsistencies noted in Carter's testimony as merely affecting his credibility. Defense counsel impeached Carter upon these inconsistencies as much as possible. The credibility of a witness is for the trier of fact to judge. (*People v. Dillon* (1975), 28 Ill. App. 3d 11, 327 N.E.2d 225.) In this case the jury clearly did not feel that the inconsistencies made Carter's testimony incredible. We will not disturb the jury's verdict.

## X.

For the foregoing reasons, the judgments of conviction for the murder of Henry Carter, the murder of Leslie Scott, and the attempt murder of Leo Carter, and imposing consecutive sentences are affirmed.

Affirmed.

LORENZ and WILSON, JJ., concur.